In the Matter of INTERNATIONAL FOOD CORPORATION, Debtor.

INTERNATIONAL FOOD CORPORA-TION OF AMERICA, Plaintiff,

v.

UNITED STATES of America, et al., Defendants,

and

Elias Moron Arosemena, etc., Intervenor/Defendant.

Elias Moron AROSEMENA, etc., Inter-venor/Defendant and Plaintiff on Counterclaim,

v.

INTERNATIONAL FOOD CORPORA-TION OF AMERICA, et al., Defendants on Counterclaim.

Elias Moron AROSEMENA, etc., Intervenor/Defendant and Plaintiff on Cross-Claim,

v.

UNITED STATES of America, et al., Defendants on Cross-Claim.

Bankruptcy No. 82–884.
Adv. No. 82–702.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Dec. 19, 1985.

Malka Isaak, Tampa, Fla., for Intern. Foods Corp.

Jeffrey W. Warren, Tampa, Fla., for Elias Moron Arosemena.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case and the matter under consideration represents a controversy with an unusual twist. This is so because, unlike in the run of the mill fraudulent transfer action, which is ordinarily brought by the Trustee or by a Debtor-in-Possession, in the present instance it is brought by a third party against a Debtor-in-Possession who seeks relief under Chapter 11 of the Bankruptcy Code. In short, in the present instance, it is the Debtor who is the recipient of the transfer alleged to be fraudulent, rather than the transferor of the property involved in the controversy.

The salient and significant facts germane to the resolution of the matter under consideration, laden with international overtones, are facially complex but after close analysis are not very intricate and are basically susceptible to a fairly easy resolution. However, before one can reach this point

and be able to unravel this tangled web, it is necessary to place the actors of this many faceted play in their proper roles.

The central character of this convoluted saga is Robert Lurie (Lurie) who in 1972 formed a corporation under the laws of the Republic of Panama under the name of Florida Peach Corporation of America, International Division (FPCAID). Lurie was the chief executive and appeared to have been the sole stockholder of FPCAID. Be that as it may, there is no question that Lurie was in sole control of the affairs of FPCAID from its inception.

Shortly after its formation, FPCAID, through a series of transactions, acquired several parcels of real property located in Marion and Sumter counties of Florida. These parcels, collectively referred to as "Properties", are known as the "Pedro Farm", the "Martin Farm", the "Belleview Farm", the "Hartman Farm", the "Coleman Farm", the "Lurie I Farm", and the "Lurie II Farm".

In 1974 or 1975, Lurie also formed another Panamanian corporation under the name of International Food Corporation (International Food), the Debtor involved in this Chapter 11 case. Just as in the case of FPCAID, Lurie was again the chief executive and possibly the sole stockholder of International Food. In any event, just as in the case of FPCAID, he was in sole control of the affairs of International Food from its inception until the present. At the time of its formation, International Food was a mere corporate shell, had no assets, had no employees, and did not conduct any business of any sort.

It is equally without serious doubt that not even the most basic elementary formalities of a normal corporate existence of either FPCAID or International Food were observed by Lurie; no stocks were ever issued (with an exception discussed below), there were no meetings of stockholders or directors ever held, and, of course, there is no evidence that any minutes or resolutions of the board of directors of the two corporations were ever kept.

In addition to FPCAID and International Food, Lurie also founded and/or incorporated the following associations and entities: Florida Peach Corporation of America, a Paraguain corporation; Florida Peach Corporation of America, Agricultural Services, a Panamanian corporation; International Food Corporation of America, a Delaware corporation; Florida Peach Corporation, American International Division Leasing Corporation; Transworld Food Corporation, N.V., a Netherlands Antilles corporation; Worldwide Agricultural Investors, Inc., a Florida corporation; AG Industries, Ltd., a Bahamanian corporation; Florida Peach Orchards, Inc., a Florida corporation; Florida Peach Co-Op, Inc., a Florida corporation; Florida Peach Corporation, a Florida corporation; Marion Orchards, Ltd., a Florida limited partnership; and the 1970 Planting Partnership, II in the Early Florida Peach Industry, a limited partnership. None of these entities engaged in any apparent business activity, with the exception of transfers of the "Properties" to, from, and among them, initiated and directed by Lurie at various times.

Beginning in 1971 and up to 1980, Lurie using FPCAID as the medium, embarked on an extensive undertaking of fund raising. This was accomplished by selling undivided "interests" in "peach planting" programs in the "Properties" described as "peach orchards". These "interests" were sold principally in Europe.

Each investor's ownership interest in one of the peach planting programs was evidenced by a document entitled an "Ownership Certificate in Orchards to be Cultivated under the 1971 Planting Program, Section IV, the Early Florida Peach Industry—Florida Peach Corporation of America, International Division, Trustee" or similar wording depending upon the planting program ("Ownership Certificate"). Each Ownership Certificate stated:

OWNERSHIP CERTIFICATE IN ORCHARDS TO BE CULTIVATED UNDER THE 1971 PLANTING PROGRAM, SECTION IV, THE EARLY FLORIDA PEACH INDUSTRY

FLORIDA PEACH CORPORATION OF AMERICA, INTERNATIONAL DIVISION, TRUSTEE

THIS IS TO CERTIFY that _____ is a Co-Owner and owns ____ shares in a twenty acre plot to be cultivated under the 1971 PLANTING PROGRAM, SECTION IV, IN THE EARLY FLORIDA PEACH INDUSTRY, each share representing a 1/1300th undivided interest in tenancy in common, such interest described on a deed to be recorded with the Clerk of Marion County, Florida, the United States of America. The total number of Co-owner shares to be issued is 1300.

The Holder agrees that all the land described on the deed aforesaid, including his interest, may be sold and conveyed on prior approval of the holders of 51 percent of the Co-owner shares, and on such sale, the net proceeds shall be distributed to the Co-owners in proportion to the interest held by each.

IN WITNESS WHEREOF, the said undersigned corporation whose European office is located at 4 rue de Rive, Geneva, Switzerland, has caused this certificate to be issued, and the interest of the Co-owner registered, this __ day of ____, 197__.

FLORIDA PEACH CORPORATION OF AMERICA, INTERNATIONAL DIVISION, TRUSTEE

The Ownership Certificate was executed by Lurie on behalf of FPCAID and delivered to the investor with a document entitled "Lease Performance Guarantee". The Lease Performance Guarantee was executed by Lurie as President of Florida Peach Corporation of America, International Division and read as follows.

LEASE PERFORMANCE GUARANTEE

WHEREAS FLORIDA PEACH CORPORATION OF AMERICA, International Division, has been established for the purpose of managing, cultivating and developing peach orchards and peaches in Florida, and for the purpose of growing, packing and shipping peaches and peach products of all kinds and descriptions, now therefore

THIS IS TO CERTIFY that _____ being a registered orchard owner with acreage shown above and is entitled to all benefits, rights, privileges and income as herein described in this agreement. The locations of your orchard has been recorded with our Grove Care Department at State Road 35, Belleview, Florida. This guarantee may be sold or transferred.

In token whereof we have hereunto affixed our signature and seal.

FLORIDA PEACH CORPORATION OF AMERICA, International Division

On the reverse side of the Lease Performance Guarantee, the following agreement was provided:

Whereas Florida Peach Corporation of America, International Division, referred to as the Company, has on its staff outstanding experienced grove service personnel and is preparing a program for the marketing of peaches and nectarines through large supermarkets, hotels and chain restaurants; and

Whereas the Company agrees to have its staff work on behalf of the orchard owner named on the reverse side so as to obtain maximum early peach production for minimum costs, with the latest technology, equipment, fertilization, techniques of ground cultivation and economies of peach production:

NOW, THEREFORE, Florida Peach Corporation of America, International Division agrees as follows:

1. To lease the acreage represented by this certificate at a rental shown below which percentage is based on the purchase price of the original certificate:

First Year 7 1/2% lease payment—paid quarterly

Second Year 8 1/4% lease payment—paid quarterly

Third Year 9 1/2% lease payment—paid quarterly

Fourth and Succeeding Years 60% of net income from fruit goes to the

applicant, remaining 40% to Florida Peach Corporation of America, International Division for its services. An Independent Auditor's Report is sent with your check.

2. The Company agrees to cultivate, maintain and manage land on behalf of the owner. Said maintenance will be done under the guidance of the Company's staff with the use of the latest techniques, and shall include labor, cultivation, fertilizing, pruning, thinning, limb removal, spraying and harvesting. If the owner desires to cultivate, maintain and manage his own land, he shall have the right to do so, upon sixty days notice to the Company. The Company also handles all packing and marketing services.

3. All peaches shipped by the Company will be boxed with special designs established by them for specific merchandising programs, with emphasis on special packages for mass sales appeal through supermarkets so as to create the greatest demand and receive the highest prices for the orchard owners.

Each share purportedly represented a 1/1300th undivided interest in a 20 acre plot in the particular section of the Property used for that planting program. (Ex. 3, T. 16–20).

Sometime in 1971, Lurie caused the title to the "Properties" comprised of 1700 acres to be transferred to Florida Peach Corporation of America, International Division, as Trustee, and later from FPCAID as Trustee to various entities controlled by him—primarily to himself as Trustee—and ultimately to International Food, the Debtor involved in this Chapter 11 case. There is no question that none of these conveyances were supported by any consideration, certainly not by any cash consideration. It is equally without doubt that there was never a formal trust created and there is no trust instrument on record either in Marion or Sumter County, although documents entitled "Deed Certificates" were recorded in the public records of Sumter and Marion Counties. Neither do these certificates identify the alleged co-owners of the various parcels by name and did not contain references to specific owners certificate share numbers and legal description of the respective planting program sections which correspond with the Ownership Certificate issued to the investor. (Ex. 2).

The transfers of the "Properties" by and between the various entities controlled by Lurie were accomplished by quit claim and at times by warranty deeds (Ex. 9–13). There is no question that Lurie was at all times the person in full control of the affairs of the transferors and the affairs of the recipients of the various transfers. As the result of all these transactions, "Properties" originally acquired and owned by FPCAID were transferred out and now, at least as a matter of public record, are owned by International Food and some other entities controlled by Lurie. It is interesting to note that Lurie at times transferred the same property to two different entities; the first by quit claim deed, the second, a short time later, by warranty deed. There is nothing in this record which explains the reason for these various and sundry transfers to these dummy entities established by Lurie, none of which appear to have had any legitimate existence. In any event, it is clear that none of the investors who were supposed to be the beneficial owners of the property, according to Lurie, were ever informed of, let alone consented to these transfers. Thus, even assuming that the investors actually obtained a cognizable interest in the "Properties" of FPCAID when they made their investment, a proposition which is not free from serious doubt, as a result of these transfers they now have no interest in the "Properties", at least as far as the public records are concerned.

It further appears that in 1981 FPCAID was adjudicated bankrupt under the laws of the Republic of Panama and Dr. Arosemena was appointed Curador for the estate of FPCAID. Shortly after the commencement of this case, Dr. Arosemena filed a petition in the Jacksonville Division of this Court to institute a proceeding in this District ancillary to the foreign bankruptcy proceeding pending in Panama. An

Order for Relief was entered in the ancillary proceeding on October 4, 1982. Dr. Arosemena also filed a complaint and sought to invalidate the transfers discussed earlier and sought to restore the "Properties" to FPCAID. In the interim, the United States Government appeared on the scene and asserted a tax lien claim against the "Properties" and intervened in the adversary proceeding. Neither Dr. Arosemena nor the United States Government had any luck conducting meaningful discovery because of Lurie's consistent refusal to respond to discovery and particularly his refusal to reveal the identity of the beneficiaries of the alleged trust claimed to exist by Lurie. As the result, the Bankruptcy Court in Jacksonville on June 7, 1982 dismissed the Chapter 11 case. The ancillary case was ultimately transferred to this Court and was consolidated with this Chapter 11 case.

Subsequent to the final evidentiary hearing, in the form of a letter to the Court, IFC raised its objection to the commencement of the ancillary case and the subsequent consolidation of that case with the above-captioned case. The objection was untimely, not properly before the Court as a matter of record, and does not merit further consideration.

The "Properties", when acquired by FPCAID, were either already encumbered by various mortgage liens and were acquired subject to the existing mortgages, or, if not, were acquired by FPCAID with small down payments, the balance of the purchase price secured by a purchase money mortgage granted by FPCAID to the sellers of the particular property. Needless to say, at the time the Panamanian bankruptcy was instituted against FPCAID most, if not all these mortgages, were in default. As the result, the mortgagees wasted no time and moved and sought to enforce their mortgage liens against the properties subject to their respective mortgage liens. Their hopes to achieve their goals were shattered in no time when International Food filed its petition for relief in this Court, which filing, of course, immediately halted all further proceedings against the "Properties" now owned by International Food as the result of the transfers discussed earlier.

On September 14, 1982, International Food filed a Complaint and sought an order authorizing the sale of the "Properties" free and clear of all liens and encumbrances. The defendants named in the Complaint were the holders of the mortgage liens on record encumbering the various parcels composing the "Properties". The U.S. Government was also named as defendant because it filed a tax lien in the amount of $7,749,423.82 in the public records of Marion and Sumter counties.

On November 22, 1982, Dr. Arosemena filed his Motion to Intervene. The Motion was heard in due course and on December 20, 1982, this Court entered an order authorizing Dr. Arosemena to intervene. Dr. Arosemena filed his Counterclaim and Crossclaim, the pleading which is the procedural vehicle used to assert the claim of fraudulent transfer. The relief sought is a decree from this Court setting aside all transfers of the "Properties" and restoring the ownership of the "Properties" to FPCAID, its original owner. The Counterclaim and Crossclaim consist of the following five counts:

Count I—Dr. Arosemena sought a modification of the automatic stay so as to permit him to prosecute the claims set forth in Counts II through V of the Counterclaim and Crossclaim;

Count II—Dr. Arosemena sought to have declared void or to avoid and set aside any and all transfers of any portion of the "Properties" in Marion and Sumter counties that have occurred or been made subsequent to acquisition of title by Florida Peach Corporation of America, International Division;

Count III—Dr. Arosemena sought declaratory judgment as to the respective rights, titles, liens or interest of the parties to the "Properties" in Marion and Sumter counties;

Count IV—Dr. Arosemena sought to quiet title to the "Properties" in Marion and Sumter counties;

Count V—Dr. Arosemena sought a preliminary injunction prohibiting any interference with title to the "Properties" in Marion and Sumter counties until the ancillary case commenced by Dr. Arosemena has been closed or dismissed.

Inasmuch as the dispute concerning the ownership of the "Properties" obviously presented a threshold question, this Court directed that all further proceedings be held in abeyance in the adversary proceeding pending a resolution of the fraudulent transfer claim asserted by Dr. Arosemena.

The claim for relief of Dr. Arosemena, although not very well articulated by the pleading, is apparently based on Fla.Stat. § 726.01 (1983), a Statute of this state, which deals with fraudulent transfer of properties in general. The Statute in question in pertinent part provides as follows:

726.01 Fraudulent Conveyances Void

Every feoffment, gift, grant, alienation, bargain, sale, conveyance, transfer and assignment of lands, .... by writing or otherwise, and every bond, note, contract, suit, judgment and execution which shall at any time hereafter be had, made or executed, contrived or devised of fraud, covin, collusion or guile, to the end, purpose or intent to delay, hinder or defraud creditors or others of their just and lawful actions, suits, debts, accounts, damages, demands, penalties or forfeitures, shall be from henceforth as against the person or persons .... or their successors .... and every one of them so intended to be delayed, hindered or defrauded, deemed, held, adjudged and taken to be utterly void, frustrate and of none effect, any pretense, color, feigned consideration, expressing of use or any other matter or thing to the contrary notwithstanding; provided, that this section, or anything shall not extend to any estate or interest in lands.... which shall be had, made, conveyed, or assured if such estate shall be upon good consideration and bona fide, lawfully conveyed or assured to any person or persons....

not having at the time of such conveyance.... any manner of notice or knowledge of such.... covin, fraud or collusion as aforesaid, anything in this section to the contrary notwithstanding.

It is the contention of Dr. Arosemena that based on the relevant facts and as it appears from the record established at the final evidentiary hearing, the transfers from FPCAID through various conduits, ultimately to International Food, were transfers without consideration caused to be made by Lurie, the mastermind of the series of transactions, who was not only the grantor but, in fact, the grantee in all these transactions; that these transactions were made for the sole purpose of hindering, delaying, and defrauding the creditors of the estate of FPCAID. Thus, based on the controlling provisions of § 726.01, all of these transfers should be declared to be void as fraudulent and the ownership of the "Properties" should be restored to FPCAID, the original owner of the "Properties".

International Food, rather than seriously question the claims of fraudulent transfer asserted by Dr. Arosemena, a proposition which facially appears to have validity, contends first that Dr. Arosemena simply has no standing to assert a claim of fraudulent transfer because such claim can only be asserted on behalf of existing creditors of FPCAID and there is no proof in this record that FPCAID, in fact, has any creditors who could have attacked these transfers as fraudulent. In addition, even assuming that the investors and creditors could have asserted the claim of fraudulent transfer, so contends International Food, there must be a showing that creditors were, in fact, injured by the transfers under consideration. Since there is no proof in this record, according to International Food, which would warrant a finding that these transfers did, in fact, cause injury, a fact indispensable for recovery under § 726.01, Dr. Arosemena is not entitled to the relief sought.

The last contention urged by International Food is based on the proposition that International Food holds title to the "Properties" as trustee on behalf of the investors who were supposed to be beneficiaries of the so-called trust—the very parties on whose behalf Dr. Arosemena is demanding relief. In sum, International Food contends that since the interest of the investors have not been adversely affected by the transfers under attack, whatever interest they had when they invested with FPCAID, they still have the same interest, thus suffered no injury.

## ISSUE OF STANDING

It is clear that Dr. Arosemena never had and has no assertable claim of his own and if he has standing to assert a claim of fraudulent transfer at all he may do so only vicariously. Thus, the initial inquiry must be addressed to the voiding powers, if any, granted to a "Curador" under the applicable laws of the Republic of Panama. Articles 1564, 1565, 1583, and 1584 of the Commercial Code of Panama provide as follows:

*Article 1564:* By virtue of the declaration of bankruptcy, the debtor is, as a matter of law, precluded and prohibited from administering and disposing of its present assets and whatever assets it may acquire during the bankruptcy proceedings. Excepted from this Article are those assets that may not be attached pursuant to the Judicial Code.—C.J. 1203, 1784, 1816, C.C. (Civil Code) 1047 and ss.1615.

*Article 1565:* The administration of the debtor's assets shall pass to the creditor group represented by the "Curador", who by virtue of his appointment shall be vested with all the capacities of a general attorney without limitations other than those specified in the Judicial Code.— 1615, 1579 ss C.J. 1816, C.C. 1655.

*Article 1583:* Upon the request of the "Curador" or any other creditor, the following acts shall be voidable notwithstanding their date of execution nor the statue of limitations: (1) Acts or contracts which might have been shams or fraudulent, such being presumed when the parties affirm or declare things or facts that are not certain; and (2) Conveyances with or without consideration when the other party had knowledge that the debtor executed the act or the contract towards the end of removing the assets or their total or partial value out of the estate or beyond reach of the creditors.—1557 Ord. 12, 1581 Ord. 1, (2) 1582, C.C. 996.

*Article 1584:* Judgments and judicial decrees that were obtained with debtor's cooperation may be impugned under the same terms as above set forth for voidable acts or contracts for the purpose of annulling them in appropriate circumstances, to the extent that they prejudice the creditors.

Having concluded that Dr. Arosemena is armed with a far broader voiding power than a trustee in Bankruptcy under § 544 of the Bankruptcy Code, one must next consider on whose behalf he can assert the claims asserted in this instance.

The only parties on whose behalf such claim could be asserted are the creditors of Florida Peach, under the applicable laws of Panama. This, in turn, calls for an analysis of the legal nature of the "claim" of the "investors". There is hardly any dispute that these foreign investors paid substantial sums to FPCAID through Lurie. It is equally clear that their investment was not payment for corporate stock of FPCAID or in any other entity controlled by Lurie, stock which, if ever issued, was issued to Lurie and not to the investors. As noted earlier, in 1973 Lurie issued, at least to some investors, a document entitled Ownership Certificate. It is not without difficulty even to guess what kind of ownership this Certificate evidenced.

In this connection, it should be noted that Lurie at various times, although it is not clear when, prepared by hand something called "Master Certificates" which purportedly vested in Lurie as trustee stock ownership in International Food, Ag Industries, and World Wide Agricultural Investors.

None of these Master Certificates identify on whose behalf Lurie was supposed to hold the Master Certificate. There is no evidence on this record to show that any of these alleged shares in International Food or Ag. Industries, Limited or World Wide Agricultural Investors (Ex. No. 3) were ever, in fact, issued. There is no evidence in this record that any of the alleged stockholders owned any stock in these entities— entities in which they never invested anything and entities in which they never dealt with to begin with. In light of the fact that these shares were never even detached from the stub, it is not difficult to assume that these Certificates were prepared by Lurie for the purpose of this trial. They are all numbered Master Share Certificate # 1 with the exception of two, one of which is marked 1B and the other is marked 2. Be that as it may, the investors were never intended to be and are not, in fact, stockholders of International Food, Ag. Industries, or World Wide Agricultural Investors.

■ There is no evidence in this record of the creation of a valid trust. As far as it appears, as noted earlier, there is no trust instrument in existence; there is no identification of the corpus of this alleged trust; the identity of the alleged beneficiaries were, at the time and are still, shrouded in mystery. It is well established in this state that a conveyance of an interest in land to one named a trustee fails to effectuate a valid conveyance of beneficial interest unless the trust instrument creating the trust is placed on record or unless the deed of conveyance identifies the beneficiaries of the trust. None of these occurred in the present instance, thus, under the controlling legal principles, the "Properties" are owned by International Food free of any beneficial interest. *Glusman v Warren,* supra.

It is equally evident that at no time did they acquire a cognizable ownership interest in any of the farms composing the "Properties" acquired by FPCAID. This is so because of Article 1583 cited above and also by virtue of the specific provisions of the Florida Statute which provides as follows:

§ 689.07(1) Fla.Stat.

Every deed or conveyance of real estate.... in which the words "trustee" or "as trustee" are added to the name of the grantee, and in which no beneficiaries are named nor the nature and purposes of the trust ... shall grant a fee simple estate ... to the grantee ... provided, that there shall not appear of record among the public records ... a declaration of trust by the grantee so described declaring the purposes of such trust....

The so-called ownership certificates issued by FPCAID as Trustee could not effectively convey interest in land. It is well settled in Florida, as codified in Chapter 689 of the Florida Statutes, that all declarations and creations of trusts in land must be manifested and proven by some writing, ".... or else they shall be utterly void and of none effect;...."

Section 689.05, Fla.Stat.

■ Although the foreign investors were not stockholders of FPCAID or any other entity controlled by Lurie including International Food and they acquired no cognizable interest in any part of the "Properties", they certainly have a "claim", conceivably unliquidated, against FPCAID. From here it follows that since they could have attacked these transfers, so can Dr. Arosemena in his representative capacity, provided under the laws of Panama a Curador has such special voiding power. This leaves for consideration the question of injury, if any produced by these transfers, and ultimately whether this record warrants the finding that these transfers were, in fact, fraudulent, thus voidable under the statute invoked by Dr. Arosemena.

This being the case, there is no doubt that the conveyance of the "Properties" by FPCAID to the several entitites and ultimately to International Food did effectively divest FPCAID of all its land holdings and, as a result, deprived the investors of the right to look to these "Properties" for satisfaction of their claims.

This leaves for consideration the ultimate question which is whether Dr. Arosemena is entitled to any of the relief he seeks. First, any resemblance between the issues raised by Dr. Arosemena in his Counterclaim and Crossclaim and the issues actually tried is not even coincidental, with the possible exception of the issues raised in Count II. As noted, the amended Crossclaim and Counterclaim seeks relief of various types, i.e. relief from automatic stay, injunctions, declaratory relief, and a declaration quieting title to the "Properties". It is evident that none of these are any longer relevant with the exception of the claim of fraudulent transfer and the request to restore the "Properties" to FPCAID.

Based on the foregoing, this Court is satisfied that the elements of a fraudulent conveyance have been proved under the laws of the Republic of Panama and by a preponderance of the evidence as required under state law, *Watson Realty Corp. v. Quinn*, 452 So.2d 568,569 (Fla.1984), and that Arosemena is entitled to a declaratory judgment vesting title to the properties at issue in Arosemena as Curador in the Panamanian bankruptcy styled Juzgado Cuarto Del Circuito De Panama, Ramo Civil, Auto No. 154.

The Court has reserved jurisdiction to address the relief sought in Count IV to determine whether the "Properties" are subject to intervening liens and the remaining Counts, Counts I, III, and V should be dismissed as moot.

A separate final judgment will be entered in accordance with the foregoing.